UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEVONTE REID,

    Petitioner,  CASE NO. 2:16-10142
    HONORABLE JOHN CORBETT O'MEARA
v.  UNITED STATES DISTRICT JUDGE

ERICK BALCARCEL,[1]

    Respondent.

_____/

# OPINION AND ORDER DENYING (1) THE PETITION FOR A WRIT OF HABEAS CORPUS, (2) A CERTIFICATE OF APPEALABILITY, AND (3) LEAVE TO APPEAL *IN FORMA PAUPERIS*

Devonte Reid, ("petitioner"), presently incarcerated at the St. Louis Correctional Facility in St. Louis, Michigan, seeks the issuance of a writ of habeas corpus pursuant to 28 U.S.C. § 2254. In his application, filed through his attorneys, Freedman Herskovic, PLC., petitioner challenges his conviction of second-degree murder as to Tim Baker, M.C.L.A. § 750.317, two counts of assault with intent to murder as to Remecoe Baker and Shadrekis Jackson, M.C.L.A. § 750.83, and felony-firearm, M.C.L.A. § 750.227b. For the reasons stated below, the application for a writ of habeas corpus is DENIED WITH PREJUDICE.

---

[1] The Court amends the caption to reflect the current warden of petitioner's incarceration.

## I. BACKGROUND

Petitioner was convicted of the above offenses following a jury trial in the Genesee County Circuit Court. He was tried together with codefendants Latrell Demetrius Windom, and Quentin Lamar Green, but in front of separate juries. This Court recites verbatim the relevant facts relied upon by the Michigan Court of Appeals, which are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1). *See Wagner v. Smith,* 581 F.3d 410, 413 (6th Cir. 2009).

> This case arises out of a fatal shooting that occurred on December 12, 2010, at the home of Tim Baker (Baker) on West Ridgeway in Flint. Remecoe Baker (Remecoe), Baker's nephew, did not have to report to work at McDonald's that day because there was a snow storm. Remecoe picked up his girlfriend, Jackson, and took her to Baker's house. Remecoe and Jackson watched a movie on his uncle's couch and both fell asleep.
>
> Remecoe was woken up by a knock at the door and heard "a bunch of footsteps just running—seem like running in the house." Remecoe was shot less than ten seconds later in the hand and arm. He passed out and then woke up again when he heard a gunshot outside. Jackson was lying on the floor and had also been shot. Remecoe could not say how many individuals came in and could only describe one as wearing a red hoodie.
>
> Jackson was woken up when she heard Baker's cell phone ring. She fell back to sleep and then heard a knock on the door. Baker opened the door and let someone in. The two men were standing at the door when "some more people came ... they just opened the door and walked in." A man said "don't move and they just started shooting." Jackson was shot in the leg and neck and rolled from the couch to the floor. The shooting moved to the outside of the house. Jackson could not move; she played dead so that they would not do something else to her. After the shooting outside stopped, several individuals came back into the house. Jackson thought

there were four individuals. All of the individuals were dressed in black, except for one man who was in a red hoodie. She heard the man in the red hoodie say "I just killed this b* * * *." She also heard them talking about looking for something. They rummaged through the house and they also checked the basement.

Remecoe had run for cover under the basement stairs. At least two individuals came back into the house and into the basement. One voice said to "go back upstairs and check, finish checking." The individual in the red hoodie was trying to get out the back door. Remecoe could hear people upstairs "tearing stuff up and one saying I didn't try to shoot—shoot to kill this b* * * *."

Shelly Conway lived next door to Baker. On the night of the shooting, she noticed a vehicle parked in front of Baker's house. She heard gunshots and then Baker crawled to her house. He had been shot multiple times. Once he was safely in her home, Conway called 911. At first Baker was able to talk, but then he lost consciousness. Conway testified that "[t]he only thing I seen was at that car it was a young fella, um getting in the driver side and he took off ..." Conway saw the man get into the car, but was not sure whether she saw him shooting. He was wearing dark clothing—red or gray. In a statement to police, Conway stated that the man had a gun. The man was yelling something, but she could not discern what he was saying. Conway "can't put a face to—to no one in particular that night."

Benny Goodman testified that he lived across the street from Baker. On the night of the shooting, Goodman was playing video games when he heard gunshots. Shootings in the neighborhood were a matter of course, so he was not particularly alarmed. Goodman first looked out the window and then went outside to get a better view. Goodman observed Baker and three other individuals "exchanging gun fire." Baker was standing on his porch and the other individuals were in Baker's driveway. Goodman also observed a car that "took off when I first looked out the window." It appeared to be a black Grand Am and the driver was wearing dark clothing. The three other individuals were running from Baker's house to the driveway. They were also dressed in dark clothing and one was wearing a distinctive red hoodie. Goodman

observed four guns—one in Baker's hands and one in each of the three men's hands. He could not say whether the driver of the vehicle also had a gun. Goodman watched as Baker fell to the ground and crawled to a neighbor's house. Two of the individuals went back into Baker's house and the one wearing the red hoodie ran around the side of the house. Goodman observed the individual in the red hoodie after he was taken into police custody.

Officers had received a dispatch to the home on Ridgeway in response to the shooting. Defendants Green and Windom were apprehended after a foot chase. Defendant Reid was found under an overhang approximately three houses down the street from Baker's home. None of the defendants had a gun in their possession at the time of their arrests.

Corey Bracey–Bradley (sic) testified that he was the driver that day and was testifying against his co-defendants as part of a plea agreement with the prosecutor. On the night in question, Bracey–Bradley (sic) met up with Green and Windom. Bracey-Bradley (sic) was driving his girlfriend's grandmother's navy blue Impala. All three men were wearing black. They drank some cough syrup and smoked "a couple blunts" of "weed." Green suggested they buy more weed so "we got to callin' people and see if we could find some weed." Green found someone "on Ridgeway."

Bracey–Bradley (sic) testified that, even though Green had money "our plans wasn't to buy no weed." Instead, they were planning to "rob the weed house." They stopped at the store where Green bought cigarettes and then picked up defendant Reid, who was wearing a red hoodie. "Everybody" was armed but Bracey–Bradley (sic) was not sure "who had what gun." Bracey–Bradley (sic) had his own gun—a .40 caliber—and Green had two guns, one of which he handed to Reid when they arrived at the weed house. Bracey–Bradley (sic) acknowledged that Reid got into the car after the plans to rob Baker were finalized, but that Green handed Reid a gun and said "we're gonna go hit this lick."

Bracey–Bradley (sic) testified that once they got to the home on Ridgeway, the plan was to "get the door open." Bracey–Bradley (sic) and Reid went to the door first. The plan was for Windom and Green to come

in behind them after the door was open. A man with dreadlocks answered the door. Bracey–Bradley (sic) explained that "after he seen the other people coming in behind us, he tried to grab me by the throat" and scratched Bracey–Bradley's (sic) neck. Bracey–Bradley (sic) "swiped [Baker's] hands down and took off." Windom and Green came in and shouted "nobody move." Bracey–Bradley (sic) heard gunshots as he was running back to the car, which was parked right in front of the house. He denied firing any shots.

In terms of physical evidence found while tracking the footprints in the snow, officers retrieved a black stocking knit cap, black ski mask, part of a sleeve or jacket cuff, and a .45 caliber gun. The physical evidence found in the home consisted of four bullets in the front door and eight spent .40 caliber shell casings from the living room floor. Clothes were scattered, dresser drawers were open, and the stove had been pulled away from the wall. Officers did not find shell casings outside because of the significant snowfall.

Testing of the .45 caliber gun found in the snow revealed that there were eleven live rounds and one bullet was missing. No usable fingerprints were recovered from the gun, but DNA evidence was compared to those of all the defendants. Baker and Reid were excluded as donors, but the known reference samples of Green, Windom and Bracey–Bradley(sic) could not be excluded as possible donors to the DNA. A .45 caliber bullet was taken from Baker's body in the autopsy, but it was not clear whether it came from the gun that was found. Another bullet from the victim came from a .40 caliber gun. Based on testing, the medical examiner concluded that over three handguns were used—at least one .45 caliber and at least two .40 caliber.

The officer in charge of the case, Sergeant Mike Angus, had the opportunity to interview each of the three defendants. Each of the defendants' stories changed numerous times. Green gave a written statement admitting that they went to the home on Ridgeway to buy weed. Green denied knowing that the plan was to rob Baker, though he knew that Reid was armed with a .40 caliber gun. Green initially stayed in the car, but then went to the front door to see what was taking so long. He got part way there when he heard gunshots. After the shooting, Green

5

went back into the house with Reid and Windom. Reid nudged Jackson and said "I just shot this b* * * *." Green ran in the backyard when police arrived. He denied ever having a weapon that day.

Like Green, Reid changed his story during the interviews. Initially, Reid denied knowing anything about the shooting. Later, Reid revised his statement. He could not remember who was driving, but described an Impala. The men were originally planning to buy a pound of marijuana, which would have cost approximately $1,000. Reid told Angus that he, Bracey–Bradley (sic) and Windom approached the house. Reid went to use the bathroom and when he came out the homeowner got into a "tussle" with the driver. Gunfire ensued and they all ran out the front door. Angus testified about a letter that Reid wrote to Windom while awaiting trial. It suggested that Windom change his statement.

In Windom's statement to Angus, he indicated that he was with Green on foot at the time of the shooting. They were going to "get some weed." At some point, an individual wearing red joined them, whom he identified as "Tayo" (Reid). They were on Ridgeway when Baker yelled out to them from his porch, asking if they wanted to buy some weed. When they said "no," Baker became belligerent and began to shoot at them. Initially, Windom told Angus that only Reid had a gun. Windom later admitted that he had a .45 caliber handgun. In a different version, Windom told Angus that while Green was planning on buying marijuana, Reid said he was going to "take" it. Windom was not sure if Reid was serious. The plan was for Reid and Green to approach the homeowner and Windom would wait outside. Reid and the homeowner started arguing once inside the house. Windom stepped into the house to see what was going on. The homeowner fired a gun and Reid fired back. Windom admitted to shooting one round out of his .45. They went back into the house after the shooting to look for people or weed in the basement. Angus told Windom that a gun was recovered near the scene. Windom admitted it was his and also indicated that Green's DNA might be found on it because Green also handled the gun. At no time in any versions of events did Windom mention Bracey–Bradley (sic), although he did reference an Impala.

*People v. Reid*, No. 312091, 2014 WL 1614524, at *1–4 (Mich. Ct. App. Apr. 22,

2014).

Petitioner's conviction was affirmed on appeal. *Id., lv. den.* 497 Mich. 889, 854 N.W.2d 883 (2014).

Petitioner seeks a writ of habeas corpus on the following grounds:

I. [a] The trial court violated [petitioner's] due process rights by requiring [petitioner] to appear in shackles at trial; [b] alternatively, defense trial counsel was constitutionally ineffective in failing to object.

II. The trial court violated [petitioner's] due process rights by permitting the jurors to ask questions of witnesses during trial.

III. [a] The prosecutor violated [petitioner's] due process rights by allowing the detective in charge of the case [Sergeant Mike Angus] to give perjured testimony that [petitioner] allegedly admitted intending to commit a robbery, where in fact [petitioner] made no such statement; [b] alternatively, defense trial counsel was constitutionally ineffective in failing to refresh the detective's recollection with a transcript of [petitioner's] statement.

## II. STANDARD OF REVIEW

28 U.S.C. § 2254(d), as amended by The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), imposes the following standard of review for habeas cases:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

7

> established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision of a state court is "contrary to" clearly established federal law if the state court arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if the state court decides a case differently than the Supreme Court has on a set of materially indistinguishable facts. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). An "unreasonable application" occurs when "a state court decision unreasonably applies the law of [the Supreme Court] to the facts of a prisoner's case." *Id.* at 409. A federal habeas court may not "issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Id.* at 410-11.

"[A] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011)(citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). Therefore, in order to obtain habeas relief in federal court, a state prisoner is required to show that the state court's rejection of his claim "was so lacking in justification that there was an

error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington,* 562 U.S. at 103. A habeas petitioner should be denied relief as long as it is within the "realm of possibility" that fairminded jurists could find the state court decision to be reasonable. *See Woods v. Etherton,* 136 S. Ct. 1149, 1152 (2016).

## III. DISCUSSION

### A. Claim # 1. The shackling claim.

Petitioner alleges that the trial court violated his due process rights by requiring that he appear in shackles at trial; alternatively, trial counsel was ineffective by failing to object.

The Michigan Court of Appeals rejected petitioner's claim, finding that any error in shackling petitioner was harmless because he failed to establish that he was actually prejudiced from being shackled, as follows:

> Here, although the trial court did not give a specific reason why Reid needed to wear restraints, the reason may be gleaned from the unusual circumstances of this particular case wherein three different defendants were tried together in front of three different juries. The crowded courtroom posed a logistical problem at times during trial. The conditions created an inherent safety issue and, had the trial court stated as much on the record, such a reason would have amounted to an essential state interest—maintaining courtroom security and order. *Deck*, 544 U.S. at 624; *Dunn*, 446 Mich. at 425, 521 N.W.2d 255.
>
> It is also obvious from our review of the record that Reid's trial

9

> counsel and the trial court took great pains to ensure that Reid's restraints could not been seen by the jurors. Thus, even if the trial court abused its discretion in requiring Reid to be shackled, there is nothing on the record to suggest that he was prejudiced. Reid cannot show prejudice as a result of the use of restraints and, therefore, is not entitled to relief. *Payne*, 285 Mich.App. at 186, 774 N.W.2d 714.

*People v. Reid*, 2014 WL 1614524, at *5.

The Michigan Court of Appeals further denied petitioner's ineffective assistance of trial counsel claim pertaining to the shackling finding:

> Reid's claim must fail because, as previously stated, there is absolutely nothing in the record to suggest that any of the jurors observed the restraints and, therefore, there was no resultant prejudice.

*Id.*

In *Deck v. Missouri*, 544 U.S. 622, 629 (2005), the U.S. Supreme Court held that "the Fifth and Fourteenth Amendments prohibit the use of physical restraints visible to the jury absent a trial court determination, in the exercise of its discretion, that they are justified by a state interest specific to a particular trial."

*Deck's* facts and holding, however, "concerned only visible restraints at trial." *Mendoza v. Berghuis*, 544 F.3d 650, 654 (6th Cir. 2008). Here, both the trial court judge and the Michigan Court of Appeals factually found that the petitioner had failed to establish that his leg restraints were visible to the jurors at his trial. In considering federal habeas petitions, a federal district court must

presume the correctness of state court factual determinations, and a habeas petitioner may rebut this presumption only with clear and convincing evidence. *See Bailey v. Mitchell*, 271 F. 3d 652, 656 (6th Cir. 2001); 28 U.S.C. § 2254(e)(1). This presumption of correctness extends to factual findings made by a state appellate court on the basis of their review of trial court records. *See Treesh v. Bagley*, 612 F.3d 424, 430. n.1 (6th Cir. 2010); *Brumley v. Wingard*, 269 F.3d 629, 637 (6th Cir. 2001)(citing *Sumner v. Mata*, 449 U.S. 539, 546-47 (1981)). The factual finding by the trial court judge and the Michigan Court of Appeals that the petitioner's leg shackles were not visible to the jurors is binding on this Court unless the petitioner can show that it is clearly erroneous. *See Earhart v. Konteh,* 589 F.3d 337, 349 (6th Cir. 2009)(citing 28 U.S.C. § 2254(e)(1)). Petitioner is not entitled to habeas relief on his claim, because he has presented no evidence that his leg shackles were visible during the trial. *Mendoza,* 544 F. 3d at 655.

The record reflects that the court addressed the visibility of the shackles by adding a curtain around the counsel table and arranging the courtroom to trial counsel's satisfaction to avoid view of petitioner's shackles.

> THE COURT : Soft shackles, which go underneath his pant leg. And there is something behind that--there's an ankle shackle that's called a soft shackle. And Mr. Theodoroff, I want you to go into the jury area and make sure that you're satisfied that cannot be seen.

>MR. THEODOROFF: That's just why I was asking Mr. Reid to move, Your Honor, so that that couldn't be seen.
>
>THE COURT: Mr. Reid, it would be your responsibility not to let the jury see those shackles.
>
>THE DEFENDANT: Yes sir.
>
>THE COURT: All right.

(T. 5/30/2012, p. 4).

Moreover, even if the petitioner's shackling presented a "close case" to the Michigan courts, this Court is not free to hold that the Michigan Court of Appeals' rejection of the petitioner's shackling claim was objectively unreasonable. *See Mendoza*, 544 F.3d at 655.

Petitioner also contends that trial counsel was ineffective for failing to object to the shackling. This Court has already rejected petitioner's shackling claim, concluding that petitioner was unable to show actual prejudice, in light of the fact that there was no evidence that the jurors saw petitioner's leg shackles. Because petitioner is unable to show that he was prejudiced by being shackled, counsel was not ineffective in failing to properly object to petitioner's shackling. *See Taylor v. McKee*, 649 F.3d 446, 451, n. 1 (6th Cir. 2011).

Petitioner is not entitled to habeas relief on his shackling claim.

**B. Claim # 2. The jury questions claims.**

Petitioner alleges that the trial court abused its discretion when it permitted the jurors to submit questions to the witnesses.

Although federal courts discourage questions by jurors in federal criminal trials, there are no cases which indicate that questions by jurors implicate a specific constitutional guarantee. There is no clearly established federal law, as determined by the Supreme Court of the United States, that holds that juror questioning of witnesses violates the Sixth or Fourteenth Amendments. *Mendoza v. Berghuis*, 544 F.3d 650, 655–56 (6th Cir. 2008). *See Slaughter v. Parker*, 450 F.3d 224, 236 (6th Cir. 2006)(no Supreme Court precedent holds that juror questioning of witnesses violates the Sixth or Fourteenth Amendments). *See also Wright v. Van Patten*, 552 U.S. 120, 126 (2008)("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.").

Furthermore, "allowing jurors to ask questions during criminal trials is permissible and best left to the discretion of the trial judge." *United States v. Collins*, 226 F.3d 457, 461 (6th Cir. 2000). Juror questions are reviewed on habeas review for a violation of due process. *See Wheeler v. Jones,* 59 F. App'x 23, 30 (6th Cir. 2003)(internal citation omitted).

The Michigan Court of Appeals rejected this portion of petitioner's claim, finding that the practice of questions posed to witnesses by the jury was sanctioned by Michigan Supreme Court precedent, in *People v. Heard*, 388 Mich. 182, 200 N.W.2d 73 (1972), as follows:

> The practice of permitting questions to witnesses propounded by jurors should rest in the sound discretion of the trial court. It would appear that in certain circumstances, a juror might have a question which could help unravel otherwise confusing testimony. In such a situation, it would aid the fact-finding process if a juror were permitted to ask such a question. We hold that the questioning of witnesses by jurors, and the method of submission of such questions, rests in the sound discretion of the trial court. The trial judge may permit such questioning if he wishes, and we hold that it was error for the judge to rule that under no circumstances might a juror ask any questions. [*Id.* at 187–188, 200 N.W.2d 73.]

*People v. Reid*, 2014 WL 1614524, at *6.

The trial court's decision to allow jurors to submit questions to the witnesses did not violate petitioner's right to a fundamentally fair trial, therefore, petitioner is not entitled to a writ of habeas corpus on this claim. *Id.* Petitioner's second claim is without merit.

**C. Claim # 3. The misstatement/perjured testimony claim.**

Petitioner claims that the prosecutor committed misconduct by allowing Sergeant Mike Angus to give perjured testimony that petitioner intended to commit a robbery, where in fact petitioner made no such statement. Petitioner

14

also claims that trial counsel was ineffective by failing to refresh Angus' recollection with a transcript of petitioner's statement.

The deliberate deception of a court and jurors by the presentation of known and false evidence is incompatible with the rudimentary demands of justice. *Giglio v. United States*, 405 U.S. 150, 153 (1972). There is also a denial of due process when the prosecutor allows false evidence or testimony to go uncorrected. *Napue v. Illinois*, 360 U.S. 264, 269 (1959)(internal citations omitted). To prevail on a claim that a conviction was obtained by evidence that the government knew or should have known to be false, a defendant must show that the statements were actually false, that the statements were material, and that the prosecutor knew they were false. *Coe v. Bell*, 161 F.3d 320, 343 (6th Cir. 1998). However, a habeas petitioner must show that a witness' statement was "indisputably false," rather than misleading, to establish a claim of prosecutorial misconduct or a denial of due process based on the knowing use of false or perjured testimony. *Byrd v. Collins*, 209 F.3d 486, 517-18 (6th Cir. 2000).

The Michigan Court of Appeals rejected petitioner's argument finding:

After reviewing both of Reid's statements to Angus, it is apparent that Reid never admitted to being involved in a plan to rob Baker, but that he and the others only went to Baker's house to purchase marijuana. Even if the other men were involved in a plan to rob Baker, Reid did not admit to having prior knowledge of that plan. However, although Angus was inaccurate in testifying that Reid was aware of the plan to rob Baker, it did not amount to

15

> perjured testimony. Angus took multiple statements from multiple defendants. He testified that he had difficulty keeping each of the statements straight, especially when all of the defendants changed their statements throughout the interviews. More than likely, Angus simply mixed the details of Reid's statement with those of his codefendants. In any event, it cannot be said that Reid's conviction was obtained through the knowing use of perjured testimony. There was considerable evidence that Reid was involved in the plan and the jury was provided with Reid's actual statements. Moreover, Reid has failed to make an offer of proof that supports his claim that the prosecutor knew that Angus had committed perjury.

*People v. Reid*, 2014 WL 1614524, at *10.

Although the Michigan Court of Appeals agreed that Sgt. Angus' testimony pertaining to a statement made by petitioner to "rob and take weed" from Baker was incorrect, the Court found that the inaccurate testimony did not amount to perjury because Sgt. Angus took multiple statements from multiple defendants and he testified that he had difficulty keeping each of the statements straight, especially when all of the defendants changed their statements throughout the interviews. The Court further found that "Angus simply mixed the details of Reid's statement with those of his codefendants," and "the jury was provided with Reid's actual statements." *Id.* The Michigan Court of Appeals reasonably found that Angus did not commit perjury, by finding that Angus most likely mixed up the details of petitioner statement with those of his codefendants.

Furthermore, conclusory allegations of perjury in a habeas corpus petition

16

must be corroborated by some factual evidence. *Barnett v. United States*, 439 F.2d 801, 802 (6th Cir.1971). Assuming that Sgt. Angus lied about giving a statement to Angus that he planned to commit a robbery, petitioner is still not entitled to habeas relief on his perjury claim, because he has failed to show that the prosecutor knew that Sgt. Angus had testified falsely on this matter. *See Rosencrantz v. Lafler,* 568 F.3d 577, 587 (6th Cir. 2009).

In his related ineffective assistance claim, petitioner alleges that counsel did not attempt to refresh the officer's memory after he testified inaccurately. The Michigan Court of Appeals found that "counsel did seek a sidebar, and sought a correction of Reid's testimony." *People v. Reid*, 2014 WL 1614524, at *11. Petitioner is not entitled to habeas relief on his third claim.

The Court will deny the petition for a writ of habeas corpus. The Court will also deny a certificate of appealability. In order to obtain a certificate of appealability, a prisoner must make a substantial showing of the denial of a constitutional right. 28 U.S.C. § 2253(c)(2). To demonstrate this denial, the applicant is required to show that reasonable jurists could debate whether, or agree that, the petition should have been resolved in a different manner, or that the issues presented were adequate to deserve encouragement to proceed further. *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). When a district court rejects a

habeas petitioner's constitutional claims on the merits, the petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims to be debatable or wrong. *Id.* at 484. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C. foll. § 2254.

For the reasons stated in this opinion, the Court will deny petitioner a certificate of appealability because reasonable jurists would not find this Court's assessment of petitioner's claims to be debatable or wrong. *Johnson v. Smith*, 219 F. Supp. 2d 871, 885 (E.D. Mich. 2002). The Court will also deny petitioner leave to appeal *in forma pauperis*, because the appeal would be frivolous. *Allen v. Stovall*, 156 F. Supp. 2d 791, 798 (E.D. Mich. 2001).

## IV. CONCLUSION

Accordingly, the Court DENIES WITH PREJUDICE the petition for a writ of habeas corpus. The Court further DENIES a certificate of appealability and and leave to appeal *in forma pauperis*.

**SO ORDERED.**

             s/John Corbett O'Meara
             United States District Judge

Date: April 27, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on this date, April 27, 2018, using the ECF system.

<u>s/William Barkholz</u><br>
Case Manager